**Philip M. STENGEL, Plaintiff,**

v.

**KAWASAKI HEAVY INDUSTRIES, LTD., Kawasaki Motors Corp., U.S.A., and Kawasaki Motors Manufacturing Corp., Defendants.**

No. CA–2–86–109.

United States District Court,
N.D. Texas,
Amarillo Division.

May 26, 1987.

Nancy Stone, Templeton & Garner, Amarillo, Tex., for plaintiff.

Donald McDonald, Kelly, Appleman, Hart & Hallman, Fort Worth, Tex., for all defendants.

Jeffrey Brooke, Bowan & Brooke, Phoenix, Ariz., Robert A. Bowan, Bowan & Brooke, Minneapolis, Minn., for defendant Kawasaki Heavy Industries, Ltd.

ORDER FOR SANCTIONS WITH REGARD TO THE (1) DISCOVERY OF TEST REPORTS REGARDING ALL TERRAIN VEHICLES, AND (2) THE DEPOSITION OF RANDAL M. HALL

J.Q. WARNICK, Jr., United States Magistrate.

On February 19, 1987, an Order was entered memorializing representations that had been made in Court by the attorneys for the Defendants. The Order had to do with production of test reports for all Model 200 Series ATV's that had been manufactured by Kawasaki. The Order of February 19, 1987, read as follows, "no Order is necessary with regard to this Motion to Compel as the attorney representing the Defendants' assured the Court that his clients had produced all test reports for 200 Series vehicles and that they had not limited the reports to a Model 200 A–1 Series."

After the Hearing in February in spite of the representation of the attorney in open Court, additional test reports were provided by the Defendants. An Order was entered on April 9, 1987, in the nature of a Show Cause to permit the Defendants to come and show why sanctions should not be imposed for their failure to have provided all of the additional reports prior to or on February 19, 1987.

A Hearing was held in the Amarillo Division of this Court on April 29, 1987. Mr. Doug Wilson, a licensed attorney, who is an In-House Counsel for Kawasaki Motor Corporation, U.S.A., testified with regard to the production of engineering tests.

Mr. Wilson testified that with regard to producing some tests there had been a "slip-up". He testified that he based his unilateral decision of what was required to be produced on the pleadings which in his opinion were general and conclusary. He also testified that they had initially limited production of test reports to Model KLT 200 A–1 all terrain vehicles (ATV). He also made the statement that he had produced what he characterized as "representative test results". This again demonstrating unilateral and not Court approved decisions of relevancy, when obviously several test reports were available.

The Plaintiff has produced for the Court's In-Camera consideration copies of all the test results that have been provided to date. There were provided to Plaintiff on January 10, 1987, thirteen (13) tests results. Then on February 5, 1987, eigh-

teen (18) additional test results were provided. Then on February 24, 1987, in California by hand delivery, eight (8) additional test reports were provided. Finally, on March 18, 1987, eight (8) additional tests were provided. The last sixteen (16) tests results were provided after the representation in Court that all of the 200 Series test reports had already been provided by the Defendants. The sixteen (16) tests provided after the February 19th In-Court representation were for 200 Series 3–Wheel ATV's. The Plaintiff's attorney was counsel of record in another Kawasaki ATV case in the U.S. District Court for the Eastern District of Texas. After test report production in the case at bar on February 24th, Plaintiff's counsel knew there were still eight (8) test reports that had not been produced in this Court. This was known because the eight (8) had been produced in the Eastern District case. Plaintiff received these only after a request for production that described each of the missing eight (8) tests with particularity. The general tenor of the testimony of Mr. Wilson and of the representations made by the Defendants' attorneys in Court was that there was no central location for the keeping of the test results on the ATVs. Counsel for the Defendants at one point in his arguments to the Court on April 29, 1987, described the record keeping of his clients as "a honeycomb" of records.

However, with regard to the forty-seven (47) test reports provided this Magistrate for examination, many of them contain notations on the cover sheets showing to whom the test reports were be circulated. Three (3) names regularly appear on those test reports. Those names are Kit Ibuki (identified as an engineer), L. Yurikusa and J. Watanabe. The following is a chronological listing of all of the test reports by date on the test report itself and under the categories provided showing who the copies of the test report were to be circulated to or that Mr. Ibuki participated in the testing.

### FIRST THIRTEEN (13) TEST REPORTS PROVIDED ON JANUARY 10, 1987

| DATE OF TEST RESULT | ORDERED CIRCULATED TO |
| --- | --- |
| July 26, 1979 | Ibuki, Yurikusa, Watanabe |
| August 1, 1979 | Ibuki, Yurikusa, Watanabe |
| August 1, 1979 | Yurikusa, Watanabe, Ibuki (participated in test) |
| August 21, 1979 | Yurikusa, Ibuki, Watanabe |
| August 29, 1979 | Yurikusa, Ibuki, Watanabe |
| September 7, 1979 | Yurikusa, Ibuki, Watanabe |
| October 30–31, 1979 | Yurikusa, Ibuki, Watanabe |
| February 27, 1980 | Watanabe, Yurikusa; however, in the column where it was approved, it bears Kit Ibuki's signature |
| April 29, 1980 | Watanabe, Yurikusa, Ibuki |
| May 20–June 11, 1980 | No circulation information on that report |
| December 28, 1978 | Yurikusa, Watanabe |
| January 29–31, 1979 | Yurikusa, Watanabe and was approved by Kit Ibuki |
| August 20, 1980 | Watanabe, Yurikusa, Ibuki |

### TEST REPORTS PROVIDED FEBRUARY 5, 1987

| | |
| --- | --- |
| August 13, 1979 | Yurikusa, Watanabe, Ibuki |
| "Concept"-bears no date | Shows no circulation |
| September 17, 1979 | Yuriksa, Watanabe, Ibuki |
| September 24–October 8, 1979 | Yurikusa, Watanabe, Ibuki (also approved by Ibuki) |
| October 27, 1979 | Yurikusa, Watanabe, Ibuki |
| October 22, 1979 | Yurikusa, Watanabe, Ibuki |
| October 25, 1979 | Yurikusa, Watanabe, Ibuki |
| November 12, 1979 | Yurikusa, Watanabe, Ibuki |
| December 3, 1979 | No circulation information |
| November 27–28, 1979 | Yurikusa, Watanabe, Ibuki (also approved by Ibuki) |
| July 9, 1980 | Yurikusa, Watanabe, Ibuki |
| September 2, 1980 October 13, 1980 | Yurikusa, Watanabe, Ibuki (also approved by Ibuki) |
| November 6, 1980 | Yurikusa, Watanabe, Ibuki |
| November 20, 1980 | Yurikusa, Watanabe, Ibuki |
| December 3–10, 1980 | Watanabe, Yurikusa and was approved by someone with the initials "K.I." |
| April 22–28, 1981 | Ibuki only |
| April 30, 1980 | Yurikusa, Watanabe |

### TESTS PRODUCED FEBRUARY 24, 1987

| | |
| --- | --- |
| October 14–15, 1982 | No circulation information |
| November 5, 1982 | No circulation information |
| June 18, 1980 | No circulation information |
| April 21, 1980 | No circulation information |
| May 23, 1980 | Ibuki |
| October 5–20, 1982 | No circulation information |
| December 1–10, 1982 | Ibuki |
| November 5–17, 1982 | No circulation information |

TESTS PRODUCED MARCH 18, 1987

| February 2, 1981 | Watanabe, Ibuki |
|---|---|
| June 13, 1980 | No circulation information |
| May 27, 1980 | Yurikusa, Ibuki |
| February 25, 1980 | Yurikusa, Watanabe, Ibuki (approved by Ibuki) |
| February 22, 1980 | Watanabe, Yurikusa, Ibuki (approved by Ibuki) |
| October 29, 1980 | Yurikusa, Ibuki |
| February 22, 1980 | Yurikusa, Watanabe, Ibuki |
| October 12, 1981 | Yurikusa, Watanabe (approved by someone with initials "K.I.") |

■ Thus, the one excuse that there was no central location for the test results, flies in the face of the documents themselves. The reports completely discredit such representations. It is plain that whatever position Watanabe and Yurikusa occupied with the Defendant(s), they are persons who regularly received copies of the test results relevant to this lawsuit. Although there was not circulation information on every report, the conclusion can readily be drawn that Ibuki, Watanabe and Yurikusa each received in their offices as central locations all of the test results. It would have been a simple matter for the Defendants to have gathered the test reports from Yurikusa, Watanabe and Ibuki. There is no reason to consider that the attorneys representing the Defendants have in any way participated in failing to comply with discovery.

Sanctions and attorneys fees are also sought with regard to the deposition of Mr. Randal M. Hall that was taken on April 2, 3, 1987, in California.

Present at such deposition for the Plaintiff was Ms. Nancy J. Stone. Representing all three (3) of the Defendants was Mr. Glen E. Johnson and Mr. Daniel McDonald. Also present, according to the deposition, in and out was Mr. Lawrence R. Green of New York City. Also representing only the Defendant, Kawasaki Heavy Industries, Limited, was Mr. Richard A. Bowman of Minneapolis, Minnesota.

A California attorney [1] was also present and representing Mr. Hall individually. The insupportable conduct of the lawyer representing Mr. Hall is amply demonstrated at Pages 6 and 223 of the Deposition. On Page 6 when Plaintiff's counsel inquired of Mr. Hall what his home address was in Fountain Valley; his lawyer interposed an objection that such information would invade his client's privacy. It was then revealed at Page 223, that this needs-to-be-protected-address was listed in a public telephone directory.

During the taking of the deposition, counsel for the Plaintiff had consulted a telephone book for Orange County, California. She discovered that Mr. Hall had a public listing of his address. Thus, on the fourth question asked the obsfucating conduct of Mr. Hall's counsel was demonstrated.

A Court Reporter, Sondra Cargile, who took Hall's deposition, testified at the April 29th Hearing. She testified that at one time during the deposition when there was a short recess, Ms. Stone left the room and counsel, Mr. Bowman, Mr. Johnson and Hall's attorney, engaged in a conversation in which they made it plain that they were intending to "jerk" Ms. Stone around.[2] Her testimony is in the record of the Hearing of April 29th. It remains uncontradicted and unimpeached. No person on behalf of the Defendants testified that such a conversation did not take place nor that the words, as described by Ms. Cargile, were inaccurate.

It is relevant to note just some of the things that occurred during the taking of the deposition. For example, the first claim that some of the testimony from Mr. Hall might violate the attorney-client privilege came from Hall's attorney. It is not apparent to the undersigned Magistrate why the attorney-client privilege would

---

1. This attorney has made no official appearance in this case. He simply appeared with Randal Hall as his lawyer, according to the deposition. Mr. Hall was by the Defendants to be fully re-imbursed for his attorney's fees. Hall was to be paid $60.00 an hour for his time. Hall's attorney was a friend of Mr. Wilson the In- House counsel. Mr. Wilson had referred Mr. Hall to this particular lawyer.

2. According to the deposition Hall, his attorney and several of the Kawasaki lawyers met together for over a day to brief and prepare Hall for this deposition.

concern Mr. Hall as a witness. The party who would want to claim the privilege would be one or all of the three (3) Kawasaki Defendants. They would be more likely to try to protect what had transpired between lawyer and their client's agent (Mr. Hall) when he was employed by their company. The Defendants logically would be the ones to have claimed the attorney-client privilege. After this objection, Mr. Bowman also objected, by chiming in like an echo, although he did not say he was objecting on the same ground. Bowman's expanded objection, as appears at Page 19, has to do with assumptions in the question as opposed to the attorney-client privilege.

Then beginning on Page 20, a series of objections are made by Hall's counsel with regard to the use of terminology by Plaintiff's counsel.

For example, at Page 20, she used the word "problem". He objected to that as being undefined, etc. Continuing examples of the same are at Page 58, the term "significance"; at Page 168 the term "implementing the design" and Page 218 the term "written test format". The written test format matter continues at Page 220.

However, after Ms. Stone left the deposition session as soon as she discovered the telephone book listing, Mr. Johnson took over the deposition of the witness. Terminology no longer seemed to be a problem for Hall's attorney. As an example, there were no objections to the use of the following terms at these pages, to-wit;

Page 232–terms "felt" and "accomplish";

Page 233–term "improvement";

Page 234–term "criticisms";

Page 244–term "responsible";

Page 244–245–term "accident proof"; and

Page 256–term "usual procedure".

In the same vein is the way the terms "subjective" and "objective" were treated with regard to tests. They seem just rather common contrasting terms that are frequently used in lawsuits involving scientific test results.

The first time the topic of subjective versus objective came up was at Page 208.

On Page 209 the attorney for Mr. Hall pursues the topic of subjective versus objective. The questioning will continue until at Page 210 the counsel for Mr. Hall will interrupt again on the same basis.

However, by contrast, when Mr. Johnson is deposing the witness and this terminology comes up, it presents no problems with regard to Hall's answering questions. At Page 266 Johnson reminds the witness that Ms. Stone had asked about subjective and objective. Then Mr. Johnson specifically asks about objective with regard to temperature measurement. No objection is voiced by Mr. Hall's counsel. Further, questions were asked with regard to objective-subjective on Pages 267, 270, 271, and 286, again without objection.

Examples of the type of comments that were made by the lawyers during the course of the deposition is demonstrated hereafter. Four (4) from the lawyer for Mr. Hall, to-wit;

1. Page 108–he said "how much can you tell us about what you did on October 2, 1984, Ma'am?" (This statement was obviously directed to counsel for the Plaintiff.)

2. Page 203–he said "Counsel, either you are not listening to the witness or you are trying to badger him I don't know which it is,....".

3. Page 208–he stated "perhaps Ms. Stone could take her own deposition".

4. Page 211–he made the statement "who was the unpleasant person that took this deposition?"

Unfortunately such commentary was not limited to that lawyer, but such conduct was participated in by Mr. Bowman in making such comments as, for example, to-wit;

1. Page 13–stating "waste of time". (In reference to Ms. Stone's questions.)

2. Page 32–making the comment, "At the hearing before the Magistrate, will you continue to unleash a torrent of nasty names and vituperative accusations as you continue to do in the written comments with which you

have interlard (sic) the file in this case with ad hominem until hell won't have it?"

3. Page 57–he said "Objection. Counsel is berating the witness. She has raised her voice. She is leaning forward over the table and pointing a pencil or pen at the witness." (This sounds more like an objection that should have been made by counsel to protect his own witness rather than counsel for one of the Defendants.)

4. Page 103–he stated "why don't you take your own deposition, counsel."

Examples of Mr. Johnson's statements are as follows, to-wit;

1. Page 108–"if you don't know how to produce evidence and ask a witness questions about something that is admissible form, either for impeachment or for some other purpose, then you can't blame Kawasaki for stonewalling to cover up your own inadequacies".

2. Page 212–the comment "big deal".

3. Page 217–he stated "Your not any more skillful in asking the question than the other lawyer was in asking the question". (He was speaking with reference to Hall's deposition in another lawsuit.)

All of this type of language can only be characterized as unprofessional and insulting sidebar comments. The reading of the deposition shows that Ms. Stone attempted to conduct herself professionally and to represent her client throughout the deposition by asking questions and generally refusing to participate in the kind of conduct that is demonstrated by the above statements and comments. Ms. Stone stayed with the deposition until it finally was apparent that the claim of privacy on the fourth question of the deposition was frivolous. When she produced a telephone book to show that he listed his home address for the public to see, even the witness began to participate in the conduct and the general atmosphere of the deposition. Hall stated at Page 223,

"First of all, I don't think the phone company is going to be very happy with you tearing pages out of their directories, but yes, it is listed in the phone book."

All of this lends credibility to the testimony of the Court Reporter that the Defendant's lawyer with Hall's lawyer had set out to "jerk" Ms. Stone around.

■ Rule 37(b)(2), Federal Rules of Civil Procedure, permits the Court to impose a wide range of sanctions for the violation of Discovery Orders. The Supreme Court has stated, "Rule 37 Sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, (and) to deter those who might be tempted to such conduct in the absence of such deterrent.'" *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763–64, 100 S.Ct. 2455, 2462–63, 65 L.Ed.2d 488 (1980), citing *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976); annotation 49 A.L.R.Fed. 831. Further, the Court may impose sanctions under its own equitable powers, *Link v. Walbash Railroad Company*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) and *Batson v. Neal Spelce Associates*, 805 F.2d 546 (5th Cir. 1986).

■ It is apparent that the conduct of the Defendants is sanctionable for the sporadic-episodic production of the test results coupled with the undisputed fact the final set of test results were only produced because counsel for the Plaintiff knew these tapes had been produced in another case in the United States District Court for the Eastern District of Texas. Plaintiff's attorney had to make a request with regard to the last eight (8) tests produced for the specific tests that she wanted from the files of the Defendants. Further, the conduct of the counsel during the taking of the deposition of Randal M. Hall, amply demonstrates their efforts to frustrate the taking of that deposition and to evidently prevent any meaningful testimony being taken on behalf of the Plaintiff.

It is noted that no previous Orders have been entered in this case with regard to the deposition of Randal M. Hall. Therefore, there were no Orders to which the deposition was subject, other than the Federal Rules of Civil Procedure as they apply to the taking of depositions and the professional rules of conduct applying to the conduct of the lawyers.

The Fifth Circuit has spoken about similar matters on several occasions for example, see *Batson v. Neal Spelce Associates, Inc.*, supra, as already cited herein.

■ The Plaintiff's attorneys have made claims for over $30,000.00 in attorney fees and expenses to be imposed as sanctions. However, it is apparent that the participation of Mr. Garner, Mr. Templeton and Mr. Roth, as attorneys in this matter and the large amount of fees claimed on their behalf is not justified and should not be allowed. All of these matters have been the concern and domain of Ms. Stone, who obviously consulted with the other lawyers in her office and co-counsel, Mr. Roth. The necessity of imposing some kind of attorneys fee penalty on the Defendants in this case will really not be fully justified until after April 3, 1987, when the deposition of Randal Hall was attempted to be taken. Further, one attorney for the Plaintiff has testified that the Plaintiff is being represented on a purely contingent basis. Therefore, the sanctions imposed with regard to the payment of attorney fees are not to be paid until the Plaintiff's attorneys have filed an assurance with this Court that if there is a successful completion of the case, whether by settlement or by trial on behalf of the Plaintiff, that Plaintiff will receive credit on the payment of his contingent fee for any attorneys fees ordered to be paid and paid by the Defendants. This is intended to insure that the Plaintiff's attorneys, who took the claim on a contingent fee, will not receive their full percentage from the Plaintiff and also be rewarded with the payment of attorneys fees for matters that wronged their client.

■ There was supplied to the Court a lengthy day-by-day computation of the hours invested. Based upon the computations made covering the period from April 6 through April 28, exclusive of the Hearing, Ms. Stone shows that she had invested 102 hours. I find that such is not a reasonable amount of time to work on the present Motions to Compel and to review depositions. By way of footnote, it has not taken that many hours for the undersigned to review all of the documents filed, to read the cases cited, research the law, read the tests, review the depositions and prepare Orders. Therefore, I find that 50 hours is a reasonable amount of time to have spent in preparation of these matters, which would be more than a full five (5) day work week just on this case alone. The fee for such matters will be allowed at $100.00 an hour, which is a reasonable attorney fee for the time and effort in the preparation for the Sanctions Hearing and the Motions to Compel. This gives a total fee of $5,000.00.

The Hearing began on April 29th and lasted that day from approximately 1:30 until 5:00, which was 3½ hours. Then on the next day there was an additional 2 hours of Hearing for a total of 5½ hours at $150.00 an hour for an additional $825.00. Therefore, attorneys fees are awarded in the total sum of $5,825.00. After the Plaintiff's attorneys have filed their Certificate herein with regard to the receipt and application of the attorneys fees, certifying that such fees will be credited on the payment of their contingent fee in the event of a successful termination of litigation, then thirty (30) days thereafter, the Defendants are ordered to pay the sum of $5,825.00 which is being imposed as attorneys fees and penalties in the nature of sanctions for the conduct of the Defendants in refusing and failing to produce the test results in this case under Rule 26, FRCP, and also for the conduct of the attorneys representing the Defendants at the taking of the Hall deposition on April 2 and 3, 1987.

A contemporaneous Order herewith concerning the use of the deposition testimony of Randal Hall and the re-deposing of such

witness is entered. All other relief herein prayed for is specifically DENIED.