Michele E. SHEPHERD, et al., Plaintiffs,

v.

AMERICAN BROADCASTING
COMPANIES, INC., et al.,
Defendants.

Civ. A. No. 88–0954.

United States District Court,
District of Columbia.

April 15, 1992.

Nkechi Taifa, Mark Lane, Member of the Bar of the State of New York, Washington, DC, for plaintiffs.

Stephen Hut, David Donovan, Wilmer, Cutler & Pickering, Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the Court on Plaintiffs' Motion for An Order To Show

Cause Why Civil Contempt Should Not Issue Against Defendants And Their Attorneys And For Sanctions Including The Entry of Default Judgment. On July 26, 1989, the Court heard testimony from Ms. Marilyn Powell. Because the testimony of Ms. Powell given at the hearing was directly in conflict with the affidavits of Ms. Carol Ornes and Mr. Robert Sam, submitted by defendants, the Court ordered a further evidentiary hearing to elicit testimony from other individuals regarding the issues raised in the motions filed July 24 and July 26, 1989.

The hearings lasted for four days and the Court heard testimony from seven witnesses. In addition, the Court has reviewed exhibits from the parties. Based on the foregoing, the Court makes the following findings of fact and conclusions of law:

## I. *FINDINGS OF FACT*

1. Plaintiffs Michele Shepherd and LaRue Graves brought this action in the Superior Court of the District of Columbia on January 31, 1986, seeking injunctive relief and compensatory and punitive damages under the District of Columbia Human Rights Act, D.C.Code Ann. Sec. 1–2501, *et seq.* (1981). Defendants removed the action to this Court on April 8, 1988. Plaintiffs allege that defendants engaged in various discriminatory practices in connection with plaintiffs' employment as the only two Black graphic artists in the Graphics Department of ABC News [1] Washington, D.c. Bureau, and that defendants retaliated against plaintiffs for their participation in protected activities. (Complaint for Damages and Injunctive Relief). Plaintiffs also seek damages for intentional infliction of emotional distress under the common law of the District of Columbia. (*Id.*)

2. On October 9, 1985 a meeting of minority employees of ABC News was held in a conference room at ABC's Washington, D.C. News Bureau. (Tr. 7–31–89, p. 75–76; 8–2–89, p. 45). Several days prior to that meeting, notices announcing the meeting were posted near the elevators on each floor of the News Bureau. (Tr. 8–1–89, p. 123, 135–36).

George Strait, a Black news correspondent who organized and chaired the meeting, had obtained permission to hold the meeting on ABC's premises from George Watson, the Bureau Chief of ABC's Washington News Bureau. (Tr. 7–30–89, p. 76; 8–2–89, p. 45). On October 10, 1985 ABC Personnel Manager Carol Ornes prepared a memorandum from the notes of Robert Sam, Senior Personnel Officer, who surreptitiously attended the meeting on behalf of management. The Ornes memorandum submitted to plaintiffs pursuant to discovery requests did not list the names or any subject matter regarding plaintiffs Michele Shepherd and LaRue Graves. (Defendants' Exh. 4).

3. Despite contradictory testimony offered by defendants' witnesses at the hearing, the Court finds, by a preponderance of the evidence, the following events to have occurred:

a. ABC Personnel Manager Carol Ornes approached recently promoted Senior Personnel Coordinator Robert Sam (Tr. 8–1–89, p. 122), an Asian–American, and told him that management in New York, specifically her supervisor Anita Hecht, had asked her to ask him whether he was going to the minority employee's meeting; that management was concerned with minority issues and wanted him to take notes for management about the meeting. (Tr. 8–1–89, p. 123, 149–151).

b. Anita Hecht was Vice President of Personnel in New York, and Robert Sam knew that Ms. Hecht was very important at ABC's Personnel Department, and that Hecht was the boss of his boss. (Tr. 8–1–89, p. 151). This was the first time that "young Mr. Sam" (as Bureau Chief Watson described him, Tr. 8–2–89, p. 47), had ever received from his supervisor, Carol Ornes, a message from her superior, directed specifically to him. (Tr. 8–1–89, p. 151–52).

c. Robert Sam testified that he made it clear and unequivocal to Carol Ornes when she asked, that he was going to attend the meeting. (Tr. 8–1–89, p. 143). Carol Ornes testified that, prior to the meeting, she did

---

1. The Court's use of the term "ABC" includes the corporate defendant American Broadcasting Companies, Inc. as well as the corporate defendant Capital Cities/ABC, Inc.

not know whether or not Mr. Sam planned to attend the meeting. (Tr. 8–1–89, p. 13).

d. Carol Ornes' secretary at the time, Marilyn Powell, testified that Mr. Sam told her that Carol Ornes wanted him to attend the meeting. (Powell Tr. 7–26–89, p. 52). Marilyn Powell also testified that Sam expressed to her that he did not want to attend the meeting, but felt that he had to go because he was asked to go by Carol Ornes. (Powell Tr. 7–26–89, p. 53). Powell testified that Sam told her that he did not want to attend the October 9, 1985 minority meeting because he had a conflict on that date and felt that he would be perceived as being from Personnel, as opposed to being present pursuant to his own interests. He stated that he did not want to be considered a management representative for purposes of the meeting. (Powell Tr. 7–26–89, p. 53). Marilyn Powell testified that she expressed concern to Mr. Sam that he should be careful and should follow his own good conscience in whether or not he attended the meeting. (Powell Tr. 7–26–89, p. 52–53).

4. Throughout this case the defendants continually asserted that plaintiffs did not have any evidence that management directed Mr. Sam to attend the meeting. (Tr. 7–31–89, p. 12–13; Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, p. 22). The Court finds that this assertion made by the defendants throughout the entire pretrial period, and during the evidentiary hearing, that Mr. Sam was not directed to attend the meeting, constitutes at the very least the deliberate use of artful language by the defendants to deceive plaintiffs and the Court.

5. Ornes testified that she never directed or encouraged Robert Sam in any way to attend the meeting. (Tr. 7–31–89, p. 66). The Court declines to credit that testimony, in view of the record, the testimony of Sam and Powell and common sense. Common sense tells the Court that a request from top-level employer to a recently hired or promoted employee is likely to carry great weight with the employee. The Court finds that Robert Sam felt an obligation to attend the minority meeting and report the findings back to his supervisor. The Court credits the testimony of Marilyn Powell, who testified that Mr. Sam did not want to attend the minority meeting, but felt that he had to go because he was asked to go by management.

6. Mr. Sam presented himself on the witness stand as a weak individual, who wished to please his former employer and its attorneys by accommodating his testimony to make it appear consistent with the testimony of his employer. For example:

a. After stating clearly and unequivocally several times in Court as well as in his sworn Declaration that he had made it clear to his supervisor, Carol Ornes, when she asked, that he definitely was going to attend the meeting, (Tr. 8–1–89, p. 143; Sam Declaration), Sam reversed himself upon being told that Ms. Ornes had testified differently. (Tr. 8–1–89, p. 143).

b. Mr. Sam testified that the conversation after the minority meeting between himself and Carol Ornes on October 10 was initiated by Ornes, and that she called him into her office, asked him what had happened at the meeting and that the two of them discussed his notes of the meeting, which he produced for her review. (Tr. 8–1–89, p. 156–7). After Sam was informed that Ornes had contradicted that testimony in every single particular, Sam then stated that he did not recall what had happened, despite the fact that he had previously testified unambiguously and specifically about the events a moment earlier. (Tr. 8–1–89, p. 161, 163.)

7. The Court finds that defendants deliberately embarked upon an improper activity when they decided to send an informer to the meeting of minority employees, a protected activity. The Court finds that the defendants attempted to deceive the plaintiffs and this Court by their continual assertions that management did not direct or encourage Mr. Sam to attend the minority meeting and to report back to management what occurred. Indeed, Mr. Sam provided uncontradicted testimony that he told ABC's attorneys that Ms. Hecht in New York had also wanted him to go to the meeting, [but the attorneys left that out of his affidavit that he signed on July 25, 1989, for filing with the court.] The Court finds that this deception by the defen-

dants places in an entirely different context their assertion that they never knew that Shepherd and Graves attended the meeting. The defendants were willing to distort to the plaintiffs and this Court how they had dispatched Sam to the minority meeting and how anxious they were to secure his report about what had taken place at the meeting. The Court finds that this major deception set the stage for, and even tends to dwarf, the false assertion that defendants did not know that Shepherd and Graves had attended the meeting.

8. The Court finds the situation all the more egregious in that there was no reason for ABC to have had an informer spy on the minority meeting. ABC Washington Bureau Chief George Watson testified that he had been in constant, frank and open communication for years with George Strait, ABC Correspondent and coordinator of the minority meetings, about the concerns of minorities at ABC, and ABC Personnel in New York was aware of that fact. (Tr. 8–2–89, p. 49–52). The ABC Vice President for Personnel in New York, Anita Hecht, could not provide the Court with a reason why she did not suggest that Mr. Watson be contacted if Personnel wished to know about minority concerns. (Tr. 7–31–89, p. 143).

9. Marilyn Powell typed the October 10, 1985 Ornes memorandum. Under oath she stated definitively that the name, Michele Shepherd, was in the memorandum which she typed. (Powell Tr. 7–26–89, p. 5; Powell Statement, 7–19–89). The Court fully credits the testimony of Marilyn Powell and found her explanations to be sincere and forthright.

10. Ms. Powell had a specific reason for her recall of these events, even though they occurred nearly four years prior to her testimony in Court. Ms. Powell testified that as she typed the name of Michele Shepherd from the notes of Carol Ornes, she did not know that Michele Shepherd was a member of a minority at ABC. She testified that she later looked up Ms. Shepherd's file to verify that she was, in fact, a minority employee. (Powell Tr., 7–26–89, p. 5–6, 16, 21, 37, 45; Powell Statement, 7–19–89).

11. Despite testimony from Powell that she generally typed about ten letters a day,

she testified that the October 10, 1985 Ornes memorandum she typed left a vivid impression upon her mind because of what she described as the unusual manner in which the meeting was reported. (Powell Tr., 7–26–89, p. 20, 41). The "unusual manner in which the meeting was reported" was the fact that an employee from Personnel was directed to surreptitiously attend the minority employees' meeting on behalf of management and to report back his findings.

12. George Strait, who was given a copy of the Ornes memorandum by Powell, buttressed the testimony of Marilyn Powell by testifying that his first and best recollection was that the Shepherd name was on the memorandum when he saw it in October of 1985. (Tr. 7–31–89, p. 84, 101). However, after informing ABC attorneys during at least three days of meetings of that fact, Mr. Strait was informed that they had the memorandum and the Shepherd name was not there. (Tr. 7–31–89, p. 84, 89).

13. Strait testified that despite his first and best recollection, if the Shepherd name was not in the memorandum, he knew he saw it somewhere, thus he must have seen it either in his agenda for the meeting, in the notes of Robert Sam, or in all of those places. (Tr. 7–31–89, p. 101).

14. Defendants have suggested that Ms. Powell typed Ms. Shepherd's name on the agenda of George Strait, and that she had not seen the Shepherd name on the Ornes memorandum. George Strait testified that the schedule of Michele Shepherd was one of the subject matters listed on an agenda which he prepared for the October 9, 1985 minority meeting. (Tr. 7–31–89, p. 78). Strait testified that he saw both Michele Shepherd and LaRue Graves at the October 9, 1985 meeting; that he led the discussion about Michele Shepherd during the meeting; that LaRue Graves spoke quite forcefully concerning it; and that more time was devoted to the agenda issue of Michele Shepherd and LaRue Graves than any other issue. (Tr. 7–31–89, p. 103–105). Although George Strait listed Marilyn Powell as among five "probable" persons who might have typed the agenda for the October 9 meeting, he

also testified that it was possible that Powell never typed the agenda at all, and that he might have even typed it himself. (Tr. 7–31–89, p. 91).

15. The Court finds that the testimony of George Strait that Powell "typed a lot of things for us" (Tr. 7–31–89, p. 79), is not inconsistent with Ms. Powell's testimony. Indeed, Powell testified that she did not become involved in minority matters at the Bureau (Powell Tr., 7–226–89, p. 45), and that she did not want any association with the minority meetings to present a problem because of her position in Personnel. (Powell Tr., 7–26–89, p. 42).

16. George Strait listed the notes of Robert Sam as another possible place he might have seen the Shepherd name, since he was told it was impossible for him to have seen it in the memorandum since it was not there now.

17. The Court credits the initial recollection of Mr. Strait that he saw the Shepherd name on the Ornes memorandum and finds that had Strait not been confronted with contrary information regarding the existence of the Shepherd name on the Ornes memorandum, his first recollection would remain that he was certain he saw the name in the memorandum. (Tr. 7–31–89, p. 84). The Court also credits the Strait analysis that he might have seen the Shepherd name from all three locations he cited: the memorandum, the agenda and the Robert Sam notes. (Tr. 7–31–89, p. 101).

18. Defendants' Exhibit 6 represents several pages from a counselling log maintained by Personnel which includes as its last column, a minority code. The name Michele Shephard (sic) appears among a handwritten list of 64 names with the minority code 02F (meaning Black female) written in.

19. The Court finds that even if Ms. Powell did write the 02 minority code for Michele Shepherd, this listing would probably not have left an impression in her mind as to the specific content of the logs. Carol Ornes testified that Ms. Powell probably accumulated numerous slips of paper over a period of time and entered them into the log at one time. (Tr. 8–1–89, p. 107). It appears that Powell would simply copy the information from the slips of papers, and this does not alter the court's conclusion that Ms. Powell did not know until she typed the Ornes memorandum that Michele Shepherd was Black.

20. The Court finds that the maintenance of the counselling logs was treated by Personnel as low priority, as evidenced by the fact that many errors were never corrected by anyone. The entries on just the few pages of logs submitted to the Court abound with errors and inconsistencies; from misspellings in names and incorrect monthly and yearly headings to the incorrect sequence of logged dates. (Tr. 8–1–89, p. 109–111).

21. The October 10, 1985 Ornes memorandum was directed to Stephen Solomon and copied to three persons: Anita Hecht, John Frisoli and Calvin Ballard. Anita Hecht, Vice President for Personnel in New York, testified that she personally reviewed her files and could not locate the original Ornes memorandum that was sent to her and which would have had her original date-stamp on it. (Tr. 7–31–89, p. 131).

22. Anita Hecht testified that she personally reviewed the files of John Frisoli and could not locate the original Ornes memorandum that was sent to him and which would have had his original date-stamp on it. Moreover, Hecht testified that she was not personally aware whether or not Mr. Frisoli ever received his original copy of the Ornes memorandum as she never questioned him about the subject. (Tr. 7–31–89, p. 131, 134, 163–64.)

23. Anita Hecht testified that she personally reviewed the files of Calvin Ballard and could not locate the original Ornes memorandum that was sent to him and which would have had his original date-stamp on it. (*Id.*, p. 159).

24. Anita Hecht testified that she personally reviewed the files of Stephen Solomon to whom the Ornes memorandum was directed and could not locate the original memorandum sent to him and which would have bore his original date-stamp. (*Id.*, p. 135).

25. Although Hecht testified that ABC does not retire its files, Hecht could provide no explanation whatsoever as to how

*four separate documents* containing original date-stamps could have disappeared. (*Id.*, p. 161, 164). A party in possession of evidence when called upon to produce it is obligated to do so or to offer a credible and forthright explanation as to the whereabouts of the best evidence before a copy, allegedly of that evidence, is produced. The Court finds that here, however, the defendants, never stating over a period of years that the original memorandum had disappeared and that every single copy of that memorandum which bore an ink mark, allegedly made contemporaneously, had also disappeared, have failed to provide a credible explanation or, indeed, any explanation at all as to the whereabouts of the best evidence in this case.

26. Defendants have asserted that a photocopied memorandum with the handwriting of Mr. Frisoli on it establishes the authenticity of the document. However, defendants decided not to present Mr. Frisoli so that he might testify and be subject to cross-examination as to whether or not the penciled handwriting was his and if it was his, when he made the penciled notes. Plaintiffs had no burden to call Mr. Frisoli as a witness, nor did the Court. In light of the other problems discussed herein with the sworn declarations filed by defendants, the Court is unwilling to accept Mr. Frisoli's tendered affidavit as establishing the truth of this important issue.

27. In the face of the impressive evidence presented by the plaintiffs with convincing clarity, the defendants, to prevail, were obligated to present evidence in a forthright and open fashion. Instead, the Court finds that the defendants submitted witnesses who did not recall circumstances which they should have recalled, witnesses who remembered nothing on cross-examination but who were willing to adopt the pre-arranged line of the defendants by offering conclusions under oath although they could not remember any of the facts upon which those conclusions were based. Some examples follow:

a. Based upon his own recollection, at the time of his in-court testimony, Robert Sam did not remember anybody who was at the minority meeting, and does not have a present recollection as to what happened at the meeting nearly four years prior. (Tr. 8–1–89, p. 191). Sam testified "(a)ll I know is I tried to write down in the memorandum what I remembered then. I don't remember anything that happened. All I know is I put down in the notes anything that I remembered then, but now I can't tell you anything about that." (Tr. 8–1–89, p. 164).

b. In his sworn declaration, however, Mr. Sam signed a false statement, prepared by counsel for the defendants, that stated, "(t)o the best of my recollection, there was no discussion during the meeting about Michele Shepherd or any complaint Ms. Shepherd had about her work schedule." Mr. Sam's testimony in Court, however, was that he did not remember anything about the meeting. (Tr. 8–1–89, p. 182). After being confronted with his own inconsistency, Mr. Sam's sworn explanation to the Court was that the two statements mean the same thing. Only after many efforts by counsel for the plaintiffs did Mr. Sam admit that the statements, "to the best of my recollection, I don't remember" and "to the best of my recollection, there was no discussion during the meeting of Michele Shepherd," are in fact different. (Tr. 8–1–89, p. 183–184).

c. The Court finds no lack by Mr. Sam of mastery of the English language which could account for his numerous, drastic and sudden testimony reversals. The Court notes that Personnel offices are in the business of relating to people, and that language is one of the key areas of people communication. The corporate defendants' own Personnel Manager deemed Robert Sam qualified enough to be hired into the position as Personnel Assistant and then, a year later, promoted him to Senior Personnel Coordinator, over other experienced employees.

d. The Court finds that perhaps the most egregious example of a witness both willing to swear to a pre-arranged conclusion, but unable to recall any factual basis for that conclusion is found in the testimony of Personnel Manager, Carol Ornes. The Court finds that Ms. Ornes' testimony was characterized by evasiveness, equivocation, inconsistencies, lapses of memory and outright untruths.

e. Ornes swore she has no recall of ever seeing the March 26, 1986 Answers of Defendants to Plaintiff Graves' Interrogatories, (Plaintiffs' Exh. 7), despite the fact that the document bears her signature and verification and she admits that it is her signature. (Tr. 8–1–89, p. 5–6, 8). Despite Ornes' admission that she had not signed many sworn statements of that type since the beginning of 1986 (Tr. 8–1–89, p. 7), and despite the fact that Ornes read through the Defendants' Answers word for word in Court, her memory still was not refreshed as to whether or not she had ever seen the document before. (Tr. 8–1–89, p. 11).

f. Although Ornes testified over and over that on October 9, 1985, she did not know whether or not Mr. Sam was going to attend the minority meeting, defendants' answer to Interrogatory number nine states that three persons knew that Mr. Sam intended to attend the October 9 meeting: Carol Ornes, Marilyn Powell, Mark Schwartz. (Plaintiffs' Exh. 7). During her testimony Carol Ornes swore that the answer to that Interrogatory was not true. (Tr. 8–1–89, p. 12). Ornes testified that she did not think that she knew and that she had no knowledge whether or not Ms. Powell and Mr. Schwartz knew whether or not Sam intended to attend the meeting. (Tr. 8–1–89, p. 13–15).

g. Ornes testified that she has no information one way or another regarding the truth of the incidents of unsatisfactory performance by Mr. Graves referred to in Interrogatory Answer number 4; she does not recall Mr. Dyball giving her any information, and she does not recall discussing the Answer with anyone prior to swearing to its accuracy. (Tr. 8–1–89, p. 12, 21).

h. Ornes' testimony is that the answer to Interrogatory number five is not true because she cannot say whether or not all of the individuals listed (Kenneth Dyball, Ben Blank, Carol Ornes, Michael Schnipper) participated in or were consulted regarding the decision to terminate the employment of La-Rue Graves with ABC. (Tr. 8–1–89, p. 21). Ornes testified that she never had a conversation with Ben Blank about Mr. Graves. (Id., p. 22). Ornes testified that she did not know whether or not Mark Schwartz partici-

pated in or was consulted regarding the decision to terminate Graves. (Id., p. 24). Ornes did not recall whether or not she talked with Michael Schnipper regarding the termination of LaRue Graves, nor did she recall receiving any information regarding Mr. Schnipper's involvement in any fashion other than by talking to him directly. (Id., p. 24).

i. Likewise, as to Interrogatory number six, Ornes testified that she did not recall whether all of the individuals listed had knowledge of the decision to terminate the employment of Mr. Graves. (Tr. 8–1–89, p. 13). Regarding Interrogatory number 7, Ornes testified that she did not recall if in fact she knew if all the individuals listed received a copy or was consulted regarding the letter from Graves to Watson. (Id., p. 13).

j. Carol Ornes also signed and verified the Answers and objections of Defendant American Broadcasting Companies, Inc. to Plaintiff Shepherd's Interrogatories, dated March 26, 1986. (Plaintiffs' Exh. 8). Ornes, however, does not recall ever having seen the Answers to Shepherd's Interrogatories which she signed and verified. (Tr. 8–1–89, p. 28). Consistent with her testimony regarding the Graves' Interrogatories, Ornes testified that the statements in the Shepherd Answers were also not true, or she does not recall whether or not they are true, with the exception of the first answer where she set forth her name as Carol Ornes and gave her address and title. (Tr. 8–1–89, p. 29).

k. In light of Ms. Ornes' testimony that she could not remember signing, under oath, two different documents which were formal, official Answers by the corporation for which she works, sworn to subsequent to the date of the Ornes memorandum, the Court simply does not find her testimony credible that she can swear that the name Michele Shepherd never appeared in the memorandum written almost four years before the evidentiary hearing.

l. After several unsuccessful attempts by plaintiffs' counsel at trying to discover if Ms. Ornes kept any type of record of her appointments, Ornes finally admitted that she had

earlier produced some pages from her 1985 calendar and that just that Saturday she last saw the calendar and discussed the calendar pages with defense counsel. (Tr. 7–31–89, p. 44, 49, 51).

m. Ornes testified that she could not recall or determine what her notes on the calendar meant. (Tr. 7–31–89, p. 51–52). The notes which Ms. Ornes could not recall the substance of were notes she specifically wrote to herself to jog her memory about appointments. For example, Plaintiffs' Exh. 12 is a calendar page from Carol Ornes' desk calendar, dated October 22, 1985. It reads, in relevant part: "Ken re schedule; call Mike Schnipper." Ornes testified that she did not know what her notation "Ken re schedule" referred to. (Tr. 8–1–89, p. 40). Ornes testified that she did not know or recall if the reference to Mike Schnipper was related to the notation, "Ken re schedule". Ornes testified that she did not recall if the reference was a reference to Mr. Dyball's schedule which he imposed on Ms. Shepherd and the reference to "call Schnipper", was a reference to bring that information to Mr. Schnipper's attention. (Tr. 8–1–89, p. 41).

n. Michael Schnipper is the Assistant General Attorney for Labor Relations for ABC. Plaintiffs' Exhibit 16 reveals that Assistant Counsel Daniel Ratner wrote Mr. Schnipper a letter on November 27, 1985 by certified mail regarding the grievance of Michele Shepherd; that ABC imposed upon her an onerous work schedule. Mr. Dyball was one of the persons designated to receive a copy of the letter. (Plaintiffs' Exh. 16).

o. Ornes' desk calendar page of Tuesday, November 12th states: "Ken re Michele's request." (Tr. 8–1–89, p. 42; Plaintiffs' Exh. 13). Ornes testified that she did not recall what that notation was about. (Tr. 8–1–89, p. 42). Ornes then testified that she may have spoken with Michele Shepherd regarding her request for a less oppressive work schedule. (Tr. 8–1–89, p. 42). She testified that it was a possibility that "Ken re Michele's request" meant that she, Ornes, was going to talk to Mr. Dyball about Michele's request. Ornes stated that "[t]hat would be a normal course of action if an employee spoke with me about an unfavorable work schedule or any other type of concern, to then discuss it with the immediate supervisor." (Tr. 8–1–89, p. 42–43).

p. Ornes' desk calendar page dated Wednesday, November 13 states, "[m]eet with Ken D," and also contains the reference "John and Anita in town." (Plaintiffs' Exh. 14). Ornes admits that the reference, "[m]eet with Ken D" refers to Kenneth Dyball, the immediate supervisor of Shepherd and Graves. Ornes testified that she did not recall if she met with him or not. (Tr. 8–1–89, p. 43–44).

q. ABC's attorneys stipulated that they supplied to plaintiffs in Court the previous day the calendar pages which were marked as plaintiffs' exhibits 12, 13 and 14. (Tr. 8–1–89, p. 44–45). Ornes' calendar page dated Thursday, November 14, which ABC's attorneys did not supply to plaintiffs in Court—although they had produced the entire diary in discovery a year earlier—makes yet another reference to Ken Dyball. (Plaintiffs' Exh. 15; Tr. 8–1–89, p. 45–46). Again, Ornes testified that she could not recall what that notation means. (Id., p. 46). She testified that she could not recall whether the notation meant that on November 13 she made an appointment to meet with Mr. Dyball and on the 14th she actually met with Mr. Dyball. (Id., p. 46). Because the calendar reference to "John and Anita in town" falls on the same date as "Meet with Ken D," it is also possible that Ornes, Dyball, Frisoli and Hecht all met together on November 13, 1985.

r. Although Carol Ornes testified that she had a luncheon appointment with George Strait and Ken Walker in November concerning the memorandum written about the minority meeting, she did not recall the date. (Tr. 8–1–89, p. 36). Ornes also did not recall if Strait and Walker discussed with her during the luncheon that one of the problems in the Graphics Department was discriminatory treatment against Michele Shepherd regarding her schedule. (Tr. 8–1–89, p. 39–40).

s. Ornes did not recall if she met with Mr. Dyball around the time of the luncheon date, nor did Ornes recall if she met with Mr. Dyball at all that year, despite her calendar

notations which referenced Dyball. (Tr. 8–1–89, p. 37, 39, 51).

28. After the Minority Employees' meeting which was attended by Michele Shepherd and LaRue Graves—where the subjects of the grievances of Shepherd and Graves in the Graphics Department were raised; where those subjects were two of the most important agenda items; where those subjects were addressed by the chairperson of the meeting; where those subjects were addressed by Graves at the meeting; and at which ABC management was represented by an informant, Robert Sam—the court finds that there was activity in Carol Ornes' calendar regarding interaction between herself and Kenneth Dyball, the immediate supervisor of Shepherd and Graves.

29. Ornes concedes that she may have discussed with Michele Shepherd Shepherd's complaints regarding her oppressive schedule in the Graphics Department. (Tr. 8–1–89, p. 42). Ornes testified that a normal course of action for her would be to discuss with an employee's immediate supervisor an unfavorable work schedule or any other type of concern. (Tr. 8–1–89, p. 42–43).

30. Upon being shown the Ornes' calendar pages mentioning his name and mentioning his name in connection with Michele Shepherd and her schedule and request and Mr. Schnipper, Dyball testified that he had no recollection about meeting with Carol Ornes. (Tr. 8–2–89, p. 8–10). Although Dyball testified that he did not recall meeting with Ornes, he stated that if in fact he did meet with her during any or all of the calendar dates specified, he did not recall what the subject matter was of those meetings. (*Id.,* p. 11).

31. Dyball testified that despite the fact that he saw the notices and knew about the minority meeting, he had no knowledge that Michele Shepherd or LaRue Graves planned to attend the meeting or did in fact attend the meeting. (Tr. 8–2–89, p. 6). Dyball testified that when he saw the notice announcing the meeting, he did not wonder whether the only two Black graphic artists under his supervision might attend the meeting, despite the fact that he testified that he was having problems with Graves and Shepherd prior to the meeting, and despite the fact that charges had previously been made public against him by a graphic artist at ABC regarding discriminatory treatment by Dyball against employees. (Tr. 8–2–89, p. 12–14).

32. The Court does not credit the testimony of Kenneth Dyball that he had no idea that Shepherd and Graves attended the meeting of minority employees. Graves testified that it was well known within the Graphics Department that he planned to attend the meeting and that the meeting itself was "a general topic of discussion in the building." (Graves Deposition, p. 395–398). The Court also does not credit the testimony of Carol Ornes that she does not remember if she met with Mr. Dyball following the minority meeting and discussed with Dyball that the two Black graphic artists under his supervision were at the meeting and that their complaints were aired and discussed.

33. Despite the "I don't remember" syndrome of Carol Ornes and Kenneth Dyball, the Court credits two pieces of evidence revealing that Ornes did in fact communicate and/or meet with Dyball shortly after the meeting of minority employees concerning the two Black graphic artists under Dyball's direct supervision: Defendant's Answers to Interrogatories which reveal that Ornes was one of the persons in management who participated or was consulted in the decision to fire LaRue Graves, and Ornes' contemporaneously recorded calendar entries which reflect that she did in fact meet and/or communicate with Dyball regarding the schedule of Michele Shepherd.

34. The Court also finds that defendant George Watson was aware of what transpired at the meeting, which would include the discussion about the Black artists in the Graphics Department. Watson testified that he had several meetings with George Strait who told him a great deal of what had transpired at the meeting. (Tr. 8–2–89, p. 46, 62). Although Watson testified that he did not remember the details of his conversations with Strait, he remembered the subject of a particular individual whose grievance, according to Strait, was not as important as the

Shepherd matter. (Tr. 8–2–89, p. 62). The Court thus finds that Strait told Watson about the grievances of Shepherd and Graves, since, as Strait has testified, no matter regarding an ABC employee discussed at that meeting was more important than the grievance of Shepherd and Graves, and no matter consumed as much time at the meeting.

35. Representative for the corporate defendants Carol Ornes also met with George Strait concerning the memo and the meeting. Despite her testimony that she did not recall if Strait discussed with her that one of the problems in the Graphics Department was discriminatory treatment against Michele Shepherd regarding her schedule (Tr. 8–1–89, p. 39–40), the Court finds that Robert Sam reported the substance of the meeting to Ornes. Sam testified that if Ms. Shepherd's case were discussed, he believes he would have put it down in his notes and that if the subject was a major subject on the agenda and it was discussed, "my nature would be to write them down." (Tr. 8–1–89, p. 202).

36. Sam also testified that he knew LaRue Graves in October of 1985 and he testified that he put down all of the names of those in attendance that he knew. Although Sam swore in his Declaration that he did not know who Michele Shepherd was in October 1985 nor did he ever come to know her subsequent to that date, his testimony in Court revealed that he knew that Ms. Shepherd worked in the Graphics Department and that he did know her by name. (Tr. 8–1–89, p. 126). Moreover, Sam testified that he knew Wayne Shepherd, the brother of Michele Shepherd, and that Sam referred to Michele Shepherd by her first name whenever he spoke to her brother about her. (Tr. 8–1–89, p. 185–186).

37. The Court finds it to be irrelevant whether or not Sam knew Michele Shepherd by face. Sam wrote down a reference to a Roland Harrison, whose name was not listed by Sam as among the attendees, and whom Mr. Sam did not know by face. However, since the Harrison matter was discussed at the meeting, Sam duly recorded his name. (Tr. 8–1–89, p. 200–201). The Court finds

that the same situation occurred with respect to Ms. Shepherd, whom Sam claims that he did not know, and that Mr. Sam recorded the name of LaRue Graves whom he did know, as well.

38. The surviving documentary evidence supports the conclusion that the defendants were well aware of the protected activity engaged in by the plaintiffs before they fired one plaintiff and rejected the plea and grievance by another plaintiff to be relieved of what she considered an oppressive work schedule. The unanswered testimony of Marilyn Powell, supported by the testimony of George Strait and Robert Sam, leads to the inescapable conclusion that defendants knew that the plaintiffs attended the minority meeting and that a substantial portion of that meeting had been addressed to their complaints. The Court finds that it could not have been otherwise, given the fact that the defendants arranged for an informer to be present at the meeting, and that informer reported back to ABC management the substance of the meeting and those who were in attendance when he recognized the person in attendance, as well as those whom he did not recognize but whose grievances were discussed.

39. Marilyn Powell expressed concern that retaliation might occur against her in her current employment as a result of her testimony. (Powell Tr. 7–26–89, p. 10). ABC's attorneys continued to contact Ms. Powell after Ms. Powell made it clear that she did not wish to discuss the matter with anyone. (*Id.*, p. 10–11). Defendants' counsel's request to Ms. Powell that an ABC attorney be present should she grant an interview to plaintiffs' counsel was based on what ABC's attorney said was a need to guard against possible inadvertent disclosure of any privileged information that Ms. Powell may have learned while she was employed as a secretary in ABC's Personnel Department. The Court concludes that ABC's attorney's actions had the effect of intimidating Ms. Powell, and were most unwise. While former employees may know privileged information, there was no legitimate basis for believing that any would be disclosed by Ms. Powell. The Court rejects ABC's argument

that inadvertent disclosure by this former secretary might then waive ABC's privilege, or that ABC's attorneys had a right to demand to be present, at any interview Ms. Powell gave to plaintiffs' counsel. Her acts or admissions were not going to be imparted to ABC—she was simply a fact witness. ABC's attorneys could not reasonably have thought otherwise.

40. Prospective witness Kristina Celich was contacted three times by telephone by an ABC attorney. On each occasion she firmly informed him that she did not wish to discuss the case. (Affidavit by Kristina Celich). Ms. Celich was also approached in person at her office by another ABC attorney, and persistently questioned about the case in the presence of her co-workers. Ms. Celich deferred the questioning to the conference room where she immediately informed the attorney that she did not appreciate his putting her on the spot in front of her co-workers and that she did not want him harassing her anymore. (Affidavit of Kristina Celich). The Court finds that the attorney took advantage of the special relationship he has as counsel for ABC News to confront Ms. Celich on her job. (Affidavit of Kristina Celich; Tr. 7–26–89, p. 25; Tr. 7–24–89, p. 17). The attorney explained that it is his "style" to approach witnesses in the manner in which he approached Ms. Celich. (Tr. 7–24–89, p. 23). Ms. Celich is still employed at ABC News and is afraid there might be some type of retaliation against her. (Affidavit of Kristina Celich).

41. The Court finds that representations in the declarations of defense witnesses drafted by attorneys for the defendants were repudiated by the witness in Court or that defense witness representations were misconstrued by defense counsel in drafting the declarations. Some examples include:

a. Robert Sam told ABC's attorneys that Carol Ornes told him that Anita Hecht told her that she, Anita Hecht, would like for Robert Sam to go to the meeting. However, no reference to that statement was placed in the declaration which the ABC lawyers prepared for Mr. Sam's signature. The declaration only states that Carol Ornes did not ask Mr. Sam to attend the meeting *or encourage him to attend.* (Tr. 8–1–89, p. 171; Sam Declaration). The Court finds that although Sam told the ABC attorneys one set of facts, the ABC attorneys composed another for the declaration. (Tr. 8–1–89, p. 184).

b. Robert Sam testified that he informed an ABC attorney during a dinner at the Great Wall restaurant, that he did not remember what took place at the minority meeting; that it was at least four or five years ago. (Tr. 8–1–89, p. 194). Sam testified that he told ABC's attorneys that if Michele Shepherd and LaRue Graves' names were on the memorandum, he would not have remembered that fact today, (Tr. 8–1–89, p. 194–95), and that the first time that he was sure that he even saw the October 10, 1985 memorandum was during the month of July 1989. (*Id.,* p. 196). The Court finds that counsel for the defendants nevertheless drafted an artful and deceptive declaration for Sam to sign.

42. The court finds that counsel for the defendants also appeared to attempt to suppress relevant information regarding the substantive issues raised by the hearing. For example, ABC's attorneys objected when Mr. Lane, during the cross-examination of Carol Ornes, requested to see Ms. Ornes' calendar pages, complaining that "Mr. Lane is going very far afield . . ." (Tr. 7–31–89, p. 53). The Court finds that those calendar pages, however, provide possibly the best direct link between knowledge that Kenneth Dyball did in fact have knowledge of the attendance of the two Black employees under his direct supervision on the Graphics Department at the minority meeting.

43. The central question which caused plaintiffs to request that the hearing be held was the refusal of the defendants to be open and forthcoming during discovery. The conduct of Ms. Ornes, other witnesses presented by the defendants, counsel for the defendants and the corporate defendant in providing documents which do not constitute the best evidence further underscores the gravity of the matter. The Court finds that the abysmal record of the defendants, their counsel, and their photocopied evidence in lieu of the real evidence compels the conclusion that the

defendants have engaged in bad faith and fraudulent conduct.

44. The defendants and their counsel have demonstrated that neither the plaintiffs nor the Court may place much confidence in the testimony of defendants' witnesses, the representations made by counsel for the defendants or the more recently manufactured evidence presented by the defendants in place of the evidence which might have, upon expert examination, revealed the depths of the fraudulent conduct of the defendants.

45. The Court finds that not one witness has been able to discredit the testimony of Marilyn Powell that she typed in the name, Michele Shepherd, into the Ornes memorandum. Defendants' attorney offered a suggestion that it is possible that someone else made a deletion on the Ornes memorandum. (Tr. 7–26–89, p. 37). However, there was no testimony or declaration from Mark Schwartz, the personnel employee who was second in command to Carol Ornes and who, according to Ornes, knew how to operate the Xerox Memorywriter. (Tr. 8–1–89, p. 62–63).

46. The Court finds that Ms. Ornes was evasive when questioned whether she discussed anything about the October 9, 1985 minority meeting with Mr. Schwartz. At first Ornes testified that her best answer is that she did not recall on any occasion at any date discussing anything about the meeting with Schwartz. (Tr. 8–1–89, p. 64). Ornes finally admitted, however, that she had asked Schwartz whether or not he gave a copy of the memo to Strait, but did not recall discussing anything else about the memo with him. (Tr. 8–1–89, 65–67). In light of the fact that the issue and reaction of Personnel to the memo was a major event in the recent history of the ABC Washington New Bureau Personnel Department, the Court finds it to be incredible that Ms. Ornes either did not or does not recall discussing this crucial matter with the individual who was second to her in command.

47. As this case was about to go to trial, years after it had been filed, plaintiffs discovered proof that Sam had been directed to attend the minority employees meeting. The Court finds that plaintiffs had relied upon the false and artfully deceptive assertions by de-

fendants and their counsel in which plaintiffs had been regularly assured, as had the Court, that Sam had neither been directed *or even encouraged* by ABC management to attend the meeting and to report back to management about the meeting. The Court finds the defendants' assertions are simply not credible. The evidence adduced at the hearing demonstrates that Sam was sent to the meeting. The evidence adduced at the hearing demonstrates by a preponderance of the evidence that Shepherd's name was typed in the Ornes memorandum. The defendants and their counsel have taken substantial and inappropriate actions to prevent the emergence of the facts. The defendants ask this Court to believe that the informant, who they sent to the minority meeting, failed to report one of the most significant events at the meeting; although admitting that she was sincere, that Marilyn Powell gave false testimony; that George Strait's original recollection of the memorandum was faulty; that Strait never reported to Watson about the grievances of the plaintiffs when he described the meeting to him; and that Ornes and Dyball never discussed Shepherd's complaints and the pending termination of Graves, despite Ornes' calendar entries to the contrary and despite the Answers to Interrogatories which Ornes signed and verified.

This, the defendants ask this Court to believe, by relying almost exclusively upon the testimony of Carol Ornes: an ABC management director who has solemnly sworn to the most important documents submitted in this case by the defendants, and who solemnly swore during the hearing before the Court that she did not recall ever seeing any of those documents, and completing her testimony by assuring the Court that almost every statement attributed to her in those documents, was incorrect.

The Court finds that the flagrant misconduct of the defendants and their counsel mandates imposition of the most severe sanctions for abuse of the judicial process, including the striking of their Answers and the entering of default judgment in plaintiffs' favor with respect to all of plaintiffs' claims against the defendants.

## II. *CONCLUSIONS OF LAW*

■ 1. It is firmly established that this Court possesses the inherent power to monitor litigation closely and to sanction litigants for abusive practices. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764–65, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980); *Carlucci v. Piper Aircraft Corp.,* 775 F.2d 1440, 1447 (11th Cir.1985); *Telectron, Inc. v. Overhead Door Corp.,* 116 F.R.D. 107, 126 (S.D.Fla.1987), and cases cited therein; *Batson v. Neal Spelce Associates,* 805 F.2d 546 (5th Cir.1986); *Stengel v. Kawasaki Heavy Industries, Lt.,* 116 F.R.D. 263, 268 (N.D.Tex.1987) (the court may impose sanctions under its own equitable powers).

■ 2. The Court's inherent power is broader and more flexible than the authority to sanction found in the Federal Rules of Civil Procedure. The authority to dismiss an action or to enter a default judgment for discovery abuses is one of the inherent powers of the court. *Roadway Express v. Piper, supra,* 447 U.S. at 765, 100 S.Ct. at 2463; *Wyle v. R.J. Reynold Industries, Inc.,* 709 F.2d 585, 589 (9th Cir.1983).

■ 3. In particular, courts have the inherent power to enter default judgment as punishment for a defendant's willful destruction of documents. As the U.S. District Court for the District of California reasoned:

Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information. While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably likely to be requested during discovery, and/or is the subject of pending discovery requests.

*Wm. T. Thompson Co. v. General Nutrition Corp.,* 593 F.Supp. 1443, 1455–66 (D.C.Cal. 1984); *citing In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 750 (E.D.N.Y.1980); *National Ass'n of Radiation Survivors v. Turnage,* 115 F.R.D. 543, 554 (N.D.Cal.1987) (sanctions for the destruction of potentially discoverable documents, regardless of whether they are specifically responsive to outstanding discovery requests, are an authorized exercise of the court's inherent power to preserve and protect its jurisdiction and the integrity of the proceedings before it); *Graham v. Teledyne–Continental Motors,* 805 F.2d 1386, 1390 n. 9 (9th Cir.1986).

4. In *Wm. T. Thompson Co. v. General Nutrition Corp., supra,* the court concluded that the ultimate sanction of striking the defendant's answer and entering default judgment was appropriate. It concluded that the defendant's destruction of critical documents deprived the plaintiff of access to objective evidence. The Court concluded that the imposition of a lesser sanction would only reward the defendant for its misconduct in the litigation. *Id.* at 1456.

5. Similarly, in *Telectron, Inc. v. Overhead Door Corp.,* 116 F.D.R. 107 (S.D.Fla. 1987), the court specifically addressed the issue of "what sanction should be imposed for the flagrant and willful destruction of records specifically called for in the production of requests served upon the Defendant in a complex antitrust case." *Id.* at 109. The Court concluded that "no sanction less than the entry of default judgment as to Defendant's liability could fairly and adequately redress this willful obstruction of the discovery process." *Id.* at 110. The Court further concluded that all lesser sanctions, such as the imposition of attorney's fees and court costs, evidence preclusion, and other similar measures standing alone or in the aggregate, "would neither ensure the plaintiff's basic right to a fair trial nor provide a truly meaningful deterrent to future acts of willful disregard for the court's rule of discovery." *Id. See also, Professional Seminar Consultants, Inc. v. Sino American Technology Exchange Council, Inc.,* 727 F.2d 1470, 1474 (9th Cir. 1984) (entry of default judgment is appropriate where there has been an order to produce documents and there had been the production of falsified documents).

■ 6. Imposition of severe sanctions is required in this case by the severity of the

abuses that took place. The record before this Court demonstrates that the defendants impeded and obstructed the litigation process by its destruction and alteration of a crucial document and through the harassment of witnesses and filing false and misleading affidavits. Therefore, the sanction of striking the defendants' answers and entering default judgment for plaintiffs in their claims against the defendants is entirely appropriate in this action. Imposition of a lesser sanction would only reward the defendants for their misconduct in this litigation.

7. In *Weisberg v. Webster*, 749 F.2d 864, 872 (D.C.Cir.1984), the Court noted that:

If dismissal is to perform the deterrent function envisioned in *National Hockey League [v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) ]*, dismissal of the entire case will often be necessary, even when the discovery dispute is focused on a single claim. If the most that can be put at risk by recalcitrant behavior is dismissal of the disputed claim, the recalcitrant party will often have an incentive to test the court. His obstreperousness may result in some compromise on the disputed claim, which works to his benefit. If he is unlucky and suffers a limited dismissal, he only loses what he would have lost anyway—the particular point at issue. Limited dismissal may present him with nothing to lose and something to gain.

Clearly, the Court finds that the same policy considerations which mandated dismissal of the entire action in *Weisberg v. Webster*, require entry of default judgment on all claims against the defendants in the instant case.

8. More specifically delineated than the court's inherent authority to impose sanctions are the powers set forth in F.R.Civ.P. 37. Rule 37 provides district courts with broad discretion in determining whether to impose a sanction and in determining what sanction to impose. *S.E.C. v. First Financial Group of Texas, Inc.*, 659 F.2d 660 (5th Cir.1981); *Dorey v. Dorey*, 609 F.2d 1128, 1135 (5th Cir.1980); *Emerick v. Fenick Industries, Inc.*, 539 F.2d 1379, 1381 (5th Cir. 1976) (when a defendant demonstrates fla-

grant bad faith and callous disregard for its responsibilities, the district court's choice of extreme sanction of striking a defendant's pleading and entering default judgment is not an abuse of discretion); *Eastway General Hosp. v. Eastway Women's Clinic*, 737 F.2d 503, 505 (5th Cir.1984).

■ 9. The Supreme Court has made clear that Rule 37 sanctions must be applied diligently both "to penalize those whose conduct may be deemed to warrant such a sanction, (and) to deter those who might be tempted to such conduct in the absence of such deterrent." *Roadway Express v. Piper*, supra, 447 U.S. at 763–64, 100 S.Ct. at 2463, quoting *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). The Court has also made clear that the most "severe in the spectrum of sanctions" provided by statute or rule must be available to district courts both to prevent unfair prejudice to the litigants and to insure the integrity of the discovery process. *See also, Aztec Steel Company v. Florida Steel Corp.*, 691 F.2d 480, 482 (11th Cir.1982).

■ 10. It is firmly established that a district court is authorized under F.R.Civ.P. 37(b)(2), to enter "judgment by default against the disobedient party" for his failure "to obey an order to provide or permit discovery." The order need not be a Rule 37(a) motion to compel, nor must it be a written one. *Professional Seminar Consultants, Inc.*, supra, 727 F.2d at 1474.

11. More serious, and certainly less remediable, than a party's failure to respond to discovery requests is the willful destruction of discoverable materials. In cases where such destruction has occurred, courts have deemed entry of default judgment to be the only appropriate sanction under Rule 37. In *Carlucci v. Piper Aircraft Corp.*, for example, the district court entered default judgment against the defendant aircraft manufacturer following its willful destruction of test flight records which were potentially detrimental to its interest in the case. Justifying this ruling, the court stated:

The policy of resolving lawsuits on their merits must yield when a party has inten-

tionally prevented the fair adjudication of the case. By deliberately destroying documents, the defendant has eliminated the plaintiffs' right to have their cases decided on the merits. Accordingly, the entry of a default is the only means of effectively sanctioning the defendant and remedying the wrong.

102 F.R.D. 472, 486 (S.D.Fla.1984). *See also, Wm T. Thompson Co. v. General Nutrition Corp., supra* (default judgment and monetary sanctions imposed where defendants willfully destroyed records both before and after the issuance of a court order mandating the preservation of such records).

12. The evidence has demonstrated the requisite causal link between the participation by plaintiffs in protected activity (the October 9, 1985 meeting of minority employees) and the adverse action taken against each of them by the defendants. (*Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982). Evidence has been established that the employer was aware that the plaintiffs had engaged in protected activity prior to the termination of Mr. Graves and the refusal to accord Ms. Shepherd relief from her oppressive schedule. Evidence was established that the defendants had the distinct opportunity subsequent to Ms. Shepherd's participation in the protected activity to relieve her from her onerous schedule but consciously chose not to in direct retaliation for the publicizing of the Shepherd complaints at the minority employees' meeting. Likewise, the employment of Mr. Graves was terminated following his vocal participation at the meeting.

13. The Court grants plaintiffs' motion for the entry of a default judgment in plaintiffs' favor on all claims.

14. This Court need not reach plaintiffs' request for an order to show cause why a civil contempt order should not issue against the defendants and their counsel for their obstruction of justice, including their destruction and alteration of a central and crucial document and deliberate misrepresentations to the Court made by defendants' counsel. Full relief will be available to plaintiffs with the entry of a default judgment.

15. Defendants' motion to strike is denied.

16. Plaintiffs are entitled to the reimbursement of attorney's fees and expenses incurred as a result of defendants' sanctionable actions, including the costs of bringing this motion. *National Ass'n of Radiation Survivors v. Turnage, supra,* 115 F.R.D. at 558; *Perkinson v. Gilbert/Robinson, Inc.*, 821 F.2d 686, 689 (D.C.Cir.1987). Moreover, as prevailing parties in light of the default judgment, plaintiffs will be entitled to statutory attorneys' fees and costs under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*

A separate order shall issue scheduling relief proceedings.

### ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED that:

1. Plaintiffs' Motion for Sanctions Including Default Judgment is hereby GRANTED.

2. Judgment by default is hereby entered in favor of plaintiffs, against defendants.

3. Plaintiffs shall, within 30 days, file a proposed relief order and supporting memorandum (with appropriate documents) setting forth their damage claims.

4. Defendants shall file their opposition to plaintiffs' proposed relief order within 15 days thereafter.

5. Plaintiffs' motion for order to show cause is DENIED.

SO ORDERED.